

## IN THE
## TENTH COURT OF APPEALS

_____

### No. 10-13-00429-CR

_____

**DANIEL PAUL CAMPBELL,**

                                                                        **Appellant**

 **v.**

**THE STATE OF TEXAS,**

                                                                        **Appellee**

_____

**From the 272nd District Court
Brazos County, Texas
Trial Court No. 12-03436-CRF-272**

_____

### MEMORANDUM  OPINION

_____

A jury convicted Appellant Daniel Paul Campbell of assaulting his girlfriend, Cassandra "Cassie" Wells, and assessed his punishment at fifty years' imprisonment. This appeal ensued.  In his sole issue, Campbell contends that the trial court abused its discretion in allowing evidence of multiple inadmissible extraneous offenses during the guilt/innocence phase of trial, which deprived him of a fair trial.  We will affirm.

Raven Eldred, Wells's sister, testified that Wells and Campbell dated for a couple of months.  They acted like a typical couple and only argued a lot when alcohol was

involved. Alcohol was involved quite a bit at the end of their relationship, however, and Campbell was becoming more controlling and obsessive and would not let Wells out of his sight. One night in May 2012 between about 9 and 10 p.m., Wells's neighbor brought Wells over to Eldred's house. Wells was in "bad shape." She was bloody and hysterical. She was limping and had scratches and bruises around her neck, scratches around her mouth, a swollen jaw, and a chipped tooth. Wells told Eldred that she and Campbell had gotten into a fight and that he had choked her. Wells thought that she was going to die. Wells did not call the police because she did not want to get Campbell in trouble, but Eldred called the police. Eldred also called Campbell and told him to get out of her mother's apartment, where the alleged assault occurred. About thirty minutes later, Eldred met the police and let them into her mother's apartment. Wells had gone to the hospital by ambulance.

On cross-examination, Eldred agreed that because she was not there, she would not know whether Campbell or Wells initiated the confrontation. Eldred also acknowledged that it appeared that Wells had been drinking alcohol that night.

Wells testified that she met Campbell while she was incarcerated and that they started dating when he was released. The relationship started off "good," but, over time, Campbell became more possessive and jealous. On the day of the incident, she and Campbell had been drinking. They visited Campbell's sister's house where they found some vodka. When they arrived back at Wells's mother's apartment where they were staying at the time, they remained outside to visit with neighbors who were having drinks and barbecuing. During this time, they drank the vodka that they had

brought back from Campbell's sister's house.

Wells testified that while talking with another woman, she divulged a personal female problem. Campbell overheard this and became upset because he thought that she was giving out too much personal information. Campbell subsequently went inside. Wells then went inside, went upstairs to the bedroom where Campbell was, and confronted him. She ultimately told Campbell that she was tired of his possessiveness and that he should get his things and leave.

Wells testified that Campbell then told her to get his keys. As she was trying to get the keys, Campbell pushed her down on the bed, put both of his hands around her neck, and started to choke her by applying pressure with his hands. She struggled with Campbell, making every effort to get away from him. Campbell let off the pressure, but as Wells tried to get to the doorway of the bedroom, Campbell grabbed her and again began choking her on the floor in front of the bed. Campbell told Wells, "I'll kill you, bitch." Wells stated that it felt like her neck was "going to be crushed" and that she was "seeing black, just like everything was fading away." Campbell eventually let off the pressure again, and Wells ran to the stairs. On about the third stair from the top, Campbell got in front of her, blocking her from leaving. At that point, she kicked Campbell, punched him in the face, and told him to let her go. Campbell then grabbed her by the face and was digging his nails into her skin. His fingers were also in her mouth, and she bit them. She ended up with cuts and scrapes in her mouth that were bleeding. Wells tried to maneuver herself around Campbell, and he grabbed her shirt and bra, but she was able to slip out of her clothes and make it to the bottom of the

stairs. She then ran to the sliding glass door, made it outside, and began screaming. Wells sat down and tried to cover herself. She was spitting up blood. Neighbors brought her a towel and gave her a shirt to cover up, and one neighbor gave her a ride to her sister's house. Wells said that she had been scared for her life that night.

On cross-examination, defense counsel elicited testimony about the differences between Wells's and Campbell's appearances. Wells testified that she is five feet, seven inches tall and weighed about 140 pounds at the time of the incident while Campbell is about five feet, two inches tall and weighed probably between 125 and 130 pounds at the time of the incident. Defense counsel also questioned Wells about whether she had burned Campbell with a cigarette during the incident. Wells replied that she "could have burned him" and that if he had burn marks, then it must have happened. But when asked about whether she had hit Campbell with an ashtray or with a remote during the incident, Wells denied hitting Campbell with anything other than her fist. Wells agreed that after the incident with Campbell, she did not want anyone to be in trouble, so she signed an affidavit of non-prosecution.

As the cross-examination continued, Wells acknowledged that she has had physical altercations with other inmates during her time in the Brazos County Jail. She said that she had been involved in about two or three altercations but that she was just defending herself in those instances. Brazos County Sheriff's Lieutenant Carey White, the custodian of records for the Jail Division, confirmed that Wells's records indicated that she had been in three altercations but that she was the victim in each incident, not the aggressor. Lieutenant White acknowledged on cross-examination, however, that he

had not personally observed any of the altercations.

Chainey Bennett testified that at the time of the incident, he was staying with his sister, who lived in an apartment next door to Wells's mother's apartment. He had gone upstairs to use the restroom when he heard "hollering" and "bawling." He went outside to find out what was going on. He found Wells sitting on the ground in only her bra and underwear and crying, coughing, and yelling for help. Wells was scared and upset. She was rocking back and forth and had little red marks on her neck. Bennett asked Wells why she was sitting out there. Wells told him that Campbell had tried to choke and kill her. Bennett got Wells a blanket to cover up, and Wells then went to her sister's house.

College Station Police Officer Andrea Mable testified that she and Sergeant Jimmy Brown were dispatched to the apartment but were then redirected to Eldred's residence. Sergeant Brown arrived at the residence before she did and determined that Wells needed medical attention. When Officer Mable saw her, Wells was hysterical and crying uncontrollably. Wells's voice was raspy, and Officer Mable could see that Wells had injuries around her neck and chest. Officer Mable stated that the red marks on Wells's neck were "more than what I've normally seen on calls for service like this." Officer Mable followed Wells to the hospital where Wells gave her statement. Wells's injuries were consistent with the statement she gave Officer Mable.

On cross-examination, Officer Mable acknowledged that injuries can be significantly worse than they were in this particular case. She said that Wells did not have any petechia. Furthermore, she acknowledged that Campbell also had an injury

on a finger on his right hand after the incident.

Lauren Beilen, a registered nurse for the College Station Medical Center Emergency Room, testified that she treated Wells after the incident with Campbell. Beilen noticed that Wells had redness around her neck, minor abrasions, and bruising on her upper extremities in multiple stages of healing. Wells also complained of blood in her mouth and had a fractured tooth. On cross-examination, Beilen acknowledged that Wells did tell her that the scratches to her extremities were done by her kitten and that some of the bruising was from a previous incident.

Bonnie Gutierrez then testified that Campbell is the father of two of her children, who were born in May 1999 and June 2000, respectively. On June 16, 1999, she and Campbell had a confrontation as she was trying to leave the apartment where they were living together. Campbell hit her in the face with his fist, which bloodied her nose. Gutierrez was holding their oldest child at the time, and he was hit too, but she did not press charges against Campbell. On cross-examination, Gutierrez admitted that she had been arrested twice for assaulting her ex-husband within about a two-day period of time. She was eventually convicted of one of the assault-family violence offenses in 2008.

In addition to the above testimony, the State offered, and the trial court admitted into evidence "for jurisdictional purposes," a stipulation of evidence providing that Campbell was convicted on August 20, 2002, in the County Court at Law No. 4 of Travis County, in Cause No. 0614114, of the offense of assault-family violence. The State also offered, and the trial court admitted "for any purpose whatsoever," the judgment and

sentence in Cause No. 614114 in the County Court at Law No. 4 of Travis County. It reflects that a jury convicted Campbell in August 2002 of assault-family violence against Rachel Campbell and that the court sentenced him to 180 days' confinement in the Travis County Jail.

After the State rested, Campbell's counsel made his opening statement, in which he stated in part, "[Campbell] left. He was minding his own business. She came and confronted him. And he's going to tell you that she struck him first, multiple times. And he's going to tell you that she burned him." Campbell then testified as follows: On May 23, 2012, he and Wells went over to his sister's house where they each drank six beers over the course of about three to four hours. Campbell also found a bottle of vodka in his sister's freezer and took some of it with him when he and Wells left to go back to her mother's apartment. When he and Wells got back to the apartment, they decided to stay outside with the neighbors, who were outside drinking. While outside, they "gulped" the vodka that Campbell had taken from his sister's house.

Campbell testified that when Wells began telling the neighbors personal information about herself, he got upset because it was information he did not know, so he went inside. About twenty minutes later, he heard Wells come inside. Wells came upstairs and started cussing and yelling at him and asking him why he always acted like that. Campbell tried to ignore her but eventually told her to either leave him alone or he was going to leave. At that point, Wells began punching him in the face. The third time she punched him, he got up, and they began to wrestle. They were wrestling on the bed when Wells took her cigarette out of the ashtray and "stabbed" it into his

arm. When Campbell let her go, Wells then grabbed the ashtray and began hitting him with it. Campbell told Wells that he was leaving, and they both tried to go out the door and down the stairs. Campbell grabbed Wells's shirt to try to go past her. She then grabbed him, and they wrestled on the stairs. When they finally both got down the stairs, Wells's shirt had ripped off because it tore when he was holding it. Wells then went out the sliding door, threw herself on the ground, and began to cry. Campbell stated that he never strangled or choked Wells.

Campbell testified that he went outside, but Bennett told him to go back inside. He went inside and washed the blood off of himself. His injuries included a busted lip, the cigarette burn, and scratches on his face, neck, and chest, as well as injuries where Wells had hit him with the ashtray, grabbed his arms, and bit his finger. Wells's sister then called him and told him to get out of her mother's house, so he packed his things and left. He was stopped and arrested after driving "maybe a few hundred feet at the most" from the driveway. Campbell stated that he repeatedly asked that pictures be taken of his injuries but that the only pictures taken were his mug shot and pictures of his hands.

Campbell testified that he and Gutierrez had a volatile relationship. She was aggressive with him, but she never assaulted him, he never assaulted her, and he was not convicted of assaulting her.

On cross-examination, the State asked Campbell if he had choked Syndi Fox, the mother of his seventeen-year-old daughter, just like he had choked Wells. Campbell replied that he had never choked Fox. Campbell also stated that he did not assault

Rachel even though he acknowledged that he had been convicted of it in 2002. Campbell also acknowledged that he was convicted of a 1997 assault causing bodily injury against Alex Dosani and a 1998 assault causing bodily injury against Darnell Williams. The State offered, and the trial court admitted into evidence, the complaints and judgments and sentences corresponding with the 1997 and 1998 assaults.[1]

Debra Pillow, a nurse at the Brazos County Jail, testified that she did the medical intake for Campbell and that he complained of blisters on his arm that he said were from cigarette burns, bite marks on his left index finger and right middle finger, scratches on his neck, a small cut on his lip, and other minor bruises. She said that the blisters on Campbell's arm were consistent with a cigarette burn.

Cynthia Reyes, Campbell's daughter, testified that she saw Wells about a week or so after the incident and that Wells told her that she had burned Campbell with a cigarette and also hit him with an ashtray. Similarly, Preston Turner, an intern for defense counsel, testified that when he and defense counsel visited Wells, she had admitted to burning Campbell with a cigarette and to hitting him with an ashtray.

---

[1] Regarding the 1997 assault of Alex Dosani, the State offered, and the trial court admitted into evidence, the complaint in Cause No. 25602-272 in the 272nd District Court of Brazos County, which alleged that, on or about September 28, 1997, Campbell did "intentionally and knowingly, while in the course of committing theft of property and with intent to obtain and maintain control of said property, cause bodily injury to ALEX DOSANI by hitting him in the head with his fist." The State also offered, and the trial court admitted into evidence, a judgment revoking probation in that cause. It reflects that Campbell was convicted for a Class A misdemeanor assault and originally sentenced to one year's confinement in the Brazos County Jail, probated for one year, and a $250 fine. Upon revoking Campbell's probation, he was sentenced to nine months' confinement in the Brazos County Jail. Likewise, regarding the 1998 assault of Darnell Williams, the State offered, and the trial court admitted into evidence, the complaint in Cause No. 183-99 in the County Court at Law No. 1 of Brazos County, which alleged that, on or about October 16, 1998, Campbell did "intentionally, knowingly and recklessly cause bodily injury to Darnell Williams by striking Darnell Williams in the head, face and body with his hands." The State also offered, and the trial court admitted into evidence, the judgment and sentence in that cause. It reflects that Campbell pleaded guilty to the offense of assault-bodily injury. He was sentenced to 120 days' confinement in the Brazos County Jail.

In rebuttal, Fox testified that when she was in a dating relationship with Campbell, he became abusive toward her. It started during her pregnancy. He made her feel terrible and did not like for her to wear makeup or use hairspray. It eventually became physical abuse. When she was about four-and-one-half months pregnant, she was sitting on the bed in his bedroom, and they were arguing. She wanted to leave, and he told her, "If you want to leave, go." But when she tried to get up and leave, he slammed her on the bed and yelled, "You were going to leave, too, weren't you?" After that, she just remembered running out the door. Fox also stated that after their daughter was born, Campbell got physical with her at her place of employment. She said that they were in the stairwell of her place of employment and that Campbell wanted to have sex but that she did not. When she tried to leave, Campbell grabbed her by the throat and slammed her up against the wall. She tried to break free, but he slammed her up against the wall again. When someone then came through the door of the stairwell, she took off and went back to work.

Finally, Fox testified that when she was eight-and-a-half months pregnant, Campbell was taking her to a doctor's visit when a car backed out of a driveway and into her side of the vehicle. Campbell pulled over and jumped out of the vehicle. He then ran up to the man that had backed into them and started hitting him. On cross-examination, Fox acknowledged that Campbell had never been convicted of assaulting her and that she did not call the police on him. She also stated that they had been separated since 1998, so the incidents about which she testified would have occurred fifteen or sixteen years ago.

**Rule 404(b)**

Campbell first contends that the trial court abused its discretion in allowing the following extraneous-offense evidence because Rule of Evidence 404(b) prohibits using extraneous offenses to prove character in conformity therewith:

- Bonnie Gutierrez's testimony that he hit her in the face and struck their child on June 16, 1999;

- the judgment and sentence that reflects that he was convicted of assault-family violence against Rachel Campbell in Cause No. 614114 in County Court at Law No. 4 of Travis County;

- the testimony that the State elicited from him on cross-examination regarding a 1997 assault on Alex Dosani and the corresponding complaint and judgment;

- the testimony that the State elicited from him on cross-examination regarding a 1998 assault on Darnell Williams and the corresponding complaint and judgment; and

- the testimony that the State elicited from him on cross-examination regarding an assault on Syndi Fox and her rebuttal testimony.[2]

We review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005).

Under Rule 404(b), evidence of other crimes, wrongs, or acts is inadmissible "to prove the character of a person in order to show action in conformity therewith." TEX. R. EVID. 404(b). Rule 404(b) also provides, however, that the evidence may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id.* When the accused

---

[2] Campbell includes in his summary of Fox's rebuttal testimony that she testified that when their daughter was born, he was inappropriate at the hospital because he was drunk. However, the trial court sustained Campbell's relevance objection to this testimony and instructed the jury to disregard it. Campbell requested a mistrial, which the trial court denied. Campbell does not complain of that ruling in this appeal.

claims self-defense, the State, to show the accused's intent, may therefore introduce evidence of other violent acts where the defendant was an aggressor. *Halliburton v. State*, 528 S.W.2d 216, 219 (Tex. Crim. App. 1975) (op. on reh'g); *Jones v. State*, 241 S.W.3d 666, 669 (Tex. App.—Texarkana 2007, no pet.).

Campbell first raised his claim of self-defense during cross-examination of prosecution witnesses. For instance, he asked Eldred whether she agreed that she would not know whether he or Wells initiated the confrontation because she was not there. Eldred agreed. Campbell also elicited testimony from Wells that she was taller and heavier than him and questioned her about several physical altercations that she had had with other inmates during her time in the Brazos County Jail. Campbell then continued his self-defense theory in his opening statement and in his own testimony. The trial court therefore did not abuse its discretion under Rule 404(b) in allowing the extraneous-offense evidence of which Campbell complains (*i.e.*, evidence of other violent acts where he was the aggressor). *See Halliburton*, 528 S.W.2d at 219 (evidence of extraneous shooting admissible to refute claim of self-defense); *Jones*, 241 S.W.3d at 669-70 (evidence of extraneous violent acts admissible to refute claim of self-defense raised in defense's opening statement); *Salazar v. State*, 222 S.W.3d 10, 15 (Tex. App.—Amarillo 2006, pet. ref'd) (evidence of appellant's use of knife in similar circumstances admissible to refute claim of self-defense raised during cross-examination of prosecution witnesses and by expert testimony on impact of alcohol and cocaine on user's aggressiveness).[3]

---

[3] Campbell notes that at one point, the trial court stated, "I think those assaultive offenses would be - - should be admissible to prove, as we said, character, if you will, of the Defendant." If the trial court's evidentiary ruling is correct on any theory of law applicable to that ruling, however, it will not be

## Rules 402 and 403

Campbell also contends that the extraneous-offense evidence should have been excluded because it was irrelevant and unfairly prejudicial in violation of Rules of Evidence 402 and 403. As stated above, we review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *McDonald*, 179 S.W.3d at 576.

Under Rule 402, "[e]vidence which is not relevant is inadmissible." TEX. R. EVID. 402. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." TEX. R. EVID. 401.

Under Rule 403, otherwise relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403.

> [A] trial court, when undertaking a Rule 403 analysis, must balance (1) the inherent probative force of the proffered evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. Of course, these factors may well blend together in practice.

*Newton v. State*, 301 S.W.3d 315, 319 (Tex. App.—Waco 2009, pet. ref'd) (quoting

*Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006) (footnote omitted)).

---

disturbed even if the trial judge gave the wrong reason for his correct ruling. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

Campbell's defense was that he acted in self-defense. As discussed above, when the accused claims self-defense, the State, to show the accused's intent, may introduce evidence of other violent acts where the defendant was an aggressor. *Halliburton*, 528 S.W.2d at 219; *Jones*, 241 S.W.3d at 669. The extraneous-offense evidence of which Campbell complains was therefore relevant to show his intent. Furthermore, Campbell's intent was the predominant issue in dispute at trial. The State therefore had a need for the evidence.

The trial court gave the standard limiting instruction in the jury charge for extraneous-offense evidence. We generally presume the jury follows the trial court's instructions in the manner presented. *Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998). Thus, the extraneous-offense evidence had limited potential to impress the jury in an irrational way. And although some time was spent on developing this evidence, we do not believe that it could cause jury confusion or distraction or cause the jury to give it undue weight, especially given the trial court's limiting instruction.

Rule 403 "envisions exclusion of [relevant] evidence only when there is a 'clear disparity between the degree of prejudice of the offered evidence and its probative value.'" *Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009) (quoting *Conner v. State*, 67 S.W.3d 192, 202 (Tex. Crim. App. 2001)). We cannot say that there is a "clear disparity" between the danger of unfair prejudice posed by the extraneous-offense evidence and its probative value.

The trial court therefore did not abuse its discretion under Rules 402 and 403 in allowing the extraneous-offense evidence of which Campbell complains. Accordingly,

we overrule Campbell's sole issue and affirm the trial court's judgment.

REX D. DAVIS
Justice

Before Chief Justice Gray,
     Justice Davis, and
     Justice Scoggins
Affirmed
Opinion delivered and filed February 12, 2015
Do not publish
[CRPM]

